UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 06-61635-CIV-COOKE/BANDSTRA

THOMAS O'HAGAN, *et al.*,

     *Plaintiffs*,

v.

M&T MARINE GROUP, LLC,

     *Defendant*.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS CAUSE was tried before me in a non-jury trial on March 24 and 26, 2010. I have carefully considered the evidence, arguments presented by counsel, applicable law and am otherwise advised in the premises. The following findings of fact and conclusions of law are therefore made pursuant to the requirements of Federal Rule of Civil Procedure 52.

### I. Findings of Fact

1. Plaintiffs Thomas O'Hagan and Francisco Arroyo are independent Maritime Contractors who live and work in Broward County, Florida.

2. On October 24, 2005, Hurricane Wilma came ashore into South Florida.

3. Plaintiffs both resided at the Apartments at Marina Bay when Hurricane Wilma hit. Plaintiffs' apartments were located directly across from Dock 8 at the Marina Bay facility.

4. At the time Hurricane Wilma came across Broward County, Florida, Plaintiffs were at home, and had a clear view of the vessels which were tied to the finger piers of Dock 8.

5. Before Hurricane Wilma came ashore, Plaintiffs worked as sub-contractors for the Defendant, M&T MARINE GROUP, LLC d/b/a/ NORTHSIDE MARINE SALES in their

capacity as marine electricians and generator specialists.

6.  Plaintiffs noticed that several brand new vessels owned by Defendant were taking on water because the floating docks the vessels were tied to were sinking and pulling the vessels over.

7.  Plaintiffs began providing services to three of the vessels by cutting the dock lines from the sinking finger piers, relocating the vessels to a seawall a few yards away, pumping water out of the vessels, and taking steps to preserve and secure the vessels.

8.  It took Plaintiffs about an hour to remove the three vessels from the floating docks and relocate them along a seawall.  Plaintiffs sought shelter after relocating the vessels, then returned to the vessels to pump water out of them.

9.  Pumping the water out of the vessels prevented further damage to the engines.

10.  Plaintiffs used hand tools, pumps, a "sawsall" cuter and other equipment worth $500.00.

11.  Plaintiffs voluntarily performed the services on Defendant's vessels.

12.  When Plaintiffs initially went out to secure the vessels, debris was flying, it was raining, and strong winds were blowing.

13.  Plaintiffs had no previous experience performing salvage operations.

14. During the course of their activities Plaintiffs were assisted by three (3) other individuals-- Alain Thelusma, Dillon Silver, and Dave (last name unknown),.

15.  Mr. Thelusma and Mr. Silver were Plaintiffs' employees, and were paid for their time.

16. Dave only assisted with untying the boats from the sinking dock.

17. The vessels were brand new and being offered for sale by Defendant, with sticker

prices of approximately $800,000.00, $700.000.00, and $400,000.00 to $500,000.00.

18.  After the hurricane, Defendant hired Plaintiffs, who performed approximately

$4,000.00 in electrical repairs per vessel.

## II.  Conclusions of Law

### A. Salvage Claim

To establish a claim for a salvage award, Plaintiffs must demonstrate:

1. the existence of a maritime peril from which the property could not have been saved without their assistance;
2. a voluntary act on their part; and
3. success in saving the property.

*See Cape Ann Towing v. M/Y "Universal Lady,"* 268 Fed. Appx. 901, 902 (11th Cir. 2008)

(citations omitted).  The only dispute between the parties is whether a maritime peril existed at

the time the Plaintiffs performed their services.

"To determine whether a maritime peril existed, the court examines whether, at the time

[that] the assistance was rendered, the ship was in a situation that might expose her to loss

or destruction."  *Fine v. Rockwood*, 895 F.Supp. 306, 309 (S.D. Fla. 1995)(citation omitted).

The danger need not be immediate or actual-- all that is necessary is a reasonable apprehension of

peril.  *Id.*  This court has found a maritime peril where a vessel was taking on water and in

danger of sinking.  *Lewis v. JPI Corp.*, No. 07-20103, 2009 WL 3761984, *3 (S.D. Fla.

November 9, 2009) (citing *The Unnamed But Identifiable Master and Crew of that Certain U.S.

Documented Vessel Bearing Documentation No. 567135 v. That Certain Unnamed Motor Vessel

Bearing Fla. Registration No. FL5607*, 592 F.Supp. 1191, 1192 (S.D. Fla. 1991); *Flagship

Marine Serv., Inc. v. Belcher Towing Co.*, 761 F.Supp. 792, 795 (S.D.Fla. 1991), *reinstated by* 23

F.3d 341 (11th Cir. 1994)).  In this case, Plaintiffs presented testimony that each of the vessels

was taking on water due to their connection to a sinking dock.  Therefore, I find that the

Plaintiffs performed a voluntary and successful salvage on vessels that were in maritime peril.

**B. Salvage Award**

After concluding that Plaintiffs have a valid claim for savage, I must also determine the

appropriate salvage award.  There is no fixed rule for determining the amount of the salvage

award, nor is the award necessarily based on comparison to other awards or percentages.  *Atlantis*

*Marine Towing, Inc. v. M/V ELIZABETH*, 346 F.Supp. 2d 1266 (S.D. Fla. 2004) (citation

omitted).  Admiralty courts have established elements the court should consider and balance

when determining the amount of the salvage award.  *Id.*  These are:

> a. labor expended by the salvors in rendering the salvage service;
> b. promptitude, skill, and energy displayed in rendering the service and saving the property;
> c. value of the property employed by the salvors in rendering the service and the danger to which such property was exposed;
> d. risk incurred by the salvors in securing the property from the impending peril;
> e. value of the property saved; and
> f. degree of danger from which the property was rescued.

*The Blackwall*, 77 U.S. 1 (1869).  In considering the aforementioned factors and applying the law

to the facts of the case, I find as follows:

**a. Labor Expended by Plaintiffs**

Plaintiffs were unsure about the exact amount of time spent performing the salvage

operation.  It is undisputed, however, that Plaintiffs spent at least three hours on the salvage of

the vessels.  Plaintiffs' efforts involved cutting lines, operating on-board pumps and relocating

the vessels to a more secure location.  A portion of this was done during hurricane force winds

that sent roof tiles flying and pouring rain.  I find that the Plaintiffs expended considerable labor

in their salvage of these three vessels.

**b. Plaintiffs' Promptitude, Skill, and Energy.**

Plaintiffs both testified they acted without delay after realizing that Defendant's vessels were in danger.  Plaintiffs' expert witness, a professional salvor, testified that he was impressed with Plaintiffs' salvage efforts in using one of the vessel's own engine to pump salt water out. Although Plaintiffs had no previous salvage experience, I find that the skill level for salvage operations employed by the Plaintiffs was moderate.

**c. Value of Property Employed by Plaintiffs.**

Mr. O'Hagan testified that the total value of the tools he used in the salvage effort was about $500.00.

**d. Risk Incurred by the Plaintiffs.**

During at least part of the salvage, Plaintiffs were in hurricane force winds, and had to move around on a dock that was about to sink.  Both Plaintiffs testified that they fell a number of times during their efforts.  During this time, debris was also flying from the force of the winds. After removing the boats from the sinking docks, the Plaintiffs returned to complete their salvage once the weather had improved.  Although Plaintiffs were not in danger of losing life or limb during the entire period of their salvage operation, I find that the risk they incurred was moderate to high.

**e. Value of the Property Salved.**

Ordinarily the fair market value of the property determines the property value for purposes of considering this factor.  *Ocean Serv. Towing and Salvage, Inc. v. Brown*, 810 F.Supp. 1258, 1263 (S.D. Fla. 1993) (citation omitted).  However, use of a pre-casualty book value for the boat and subtracting estimated repair costs is a permissible method where there is no established market value for the vessel.  *Id.*  Mr. Arroyo testified that he saw the sale prices

offered for each of the three vessels salved, which totaled approximately $1,950,000.00.[1]  After

the salvage, Mr. O'Hagan was hired by Defendant to perform electrical repair work on the three

vessesl, which totaled $4,000.00 per vessel.  Both Plaintiffs asserted that the brand new vessels

were in good condition following the salvage.  Defendant did not present any evidence

contradicting these amounts, nor any evidence regarding the post-salvage value of the vessels.[2]

Given the only evidence before me, I am approximating the post salvage value at $1,938,000.00.

*Accord Rand v. Lockwood*, 16 F.2d 757, 759-60 (4th Cir. 1927) (stating that in salvage cases, it is

unnecessary to reach anything more precise than a rough approximation of the worth of the

salved property in the condition in which it was upon the completion of the salvage service).

**f. Degree of Danger from Which the Property was Rescued.**

Plaintiffs testified the vessels were being pulled down by the docks to which they were

attached.  One witness, who also lived in the Apartments at Marina Bay, stated that the vessels

were listing dramatically because they were attached to a sinking dock that was unsuitable for

boats to be tied to.  The dock sank once Plaintiffs cut the line attaching the vessels to it.  Once

the vessels were placed safely along the seawall, the salt water the vessels had taken on also

presented a danger of destroying the engines, which Plaintiffs prevented by pumping this water

out.  In light of these facts, I find that the vessels were in a medium degree of danger.

**Conclusion**

In light of these factors, I find that the salvage award in this case should be fifteen percent

---

[1]Mr. Arroyo stated that the sticker prices of the vessels was $700,000.00, $800,000.00 and between $400,000.00 and $500,000.00.  For purposes of this approximation, I estimated the sticker price of the third vessel as $450,000.00.

[2]Defendant put only one witness on during its case– a meteorological expert whose testimony was limited to the weather data that existed during Hurricane Wilma.

(15%) of the post salvage value of the vessels.  Recent cases in this district have placed a five -

ten percent (5-10%) value award on salvage efforts that were considered low level salvages.  *See,*

*e.g. Lewis v. JPI Corp.*, No. 07-20103, 2009 WL 3761984 (S.D. Fla. November 9, 2009)

(awarding 5% value for salvage that consisted of only 10-15 minutes of minimal labor);

*Triplecheck, Inc. v. Creole Yacht Charters Ltd.*, No. 05-21182, 2007 WL 917276 (S.D. Fla.

March 25, 2007) (awarding 5% value where salvage consisted of pumping out water from boat,

and no danger was present); *Miami Yacht Divers, Inc. v. M/V All Access*, No. 06-61729, 2007

WL 2484309 (S.D. Fla. August 29, 2007) (awarding 5-10% of value for low level salvage that

consisted of 30 minutes of salvage effort).  Plaintiffs' salvage efforts consisted of a moderate to

medium level salvage.

        The testimony shows that the three vessels were worth post-casualty $1,938,000.00, and

as a percentage of the value of the boats, Plaintiffs are entitled to an award of 15%, based upon

the value of the vessels successfully saved from total loss, for a total award of $ 290,700, plus

pre-judgment interest.  This amount should be divided equally between the Plaintiffs.[3]   A

separate Final Judgment will be entered consistent with these Findings of Fact and

Conclusions of Law.

        **DONE AND ORDERED** in Chambers, Miami, Florida this 30th day of March 2010.

*Marcia G. Cooke*
_____

MARCIA G. COOKE
United States District Judge

---

[3]Defendant argues that three individuals were present and assisted in the salvage effort. Two of those individuals, Alain Thelusma and Dillon Silver were employed by Plaintiffs, and Plaintiffs paid them for their time and efforts.  There has been no evidence presented as to the extent of the effort expended by the third individual, and I do not find mere allusions to his presence during the salvage sufficient to include him as a co-salvor.

cc:

Honorable Ted E. Bandstra

All counsel of record